

December 13, 2024

**VIA ECF**
Hon. Ona T. Wang
Magistrate Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

                                Re: **Gismundi et al. v. City of New York**,
                                   Case No.1:23-cv-06145-JPC-OTW

Dear Judge Wang:

      Pursuant to *Cheeks v. Freeport Pancake House, Inc.,* 796 F.3d 199, 206 (2d Cir. 2015), Plaintiffs respectfully submit this letter on behalf of the Parties in support of approval of the negotiated Settlement Agreement ("Agreement" or "Settlement") between Plaintiffs and Defendant, the City of New York ("City" or "Defendant") in the above-referenced case brought under the Fair Labor Standards Act ("FLSA").

      For the reasons set forth below, and as Your Honor knows from the Parties' arms-length negotiations during two pre-settlement conferences, the Settlement is a fair and reasonable resolution of a *bona fide* dispute. Accordingly, the Parties respectfully request that it be approved. The Settlement Agreement (**Exhibit 1**), and a Proposed Order (**Exhibit 2**) are attached, along with a supporting declaration from Plaintiffs' Counsel, Gregory K. McGillivary (**Exhibit 3**) and Hope Pordy (**Exhibit 4**).

      Plaintiffs—416 individuals employed by the Defendant as Assistant City Highway Repairers ("ACHR") and Highway Repairers ("HR")—have been informed of the terms of the Settlement, including the distribution methodology, their individual Settlement Payments, the amount of the Service Awards, and the amount allocated to attorneys' fees and expenses. They have been provided with an opportunity to review the Settlement Agreement and dispute their allocated payments, or to otherwise object to the Settlement terms. ***There have been no objections to the Settlement and no disputes have been submitted.*** Pursuant to Paragraph 7.1 of the Agreement, should the Court deem a settlement approval conference necessary, the Parties request that a telephonic conference be set at a time convenient to the Court.[1]

      **I.**      **Claims Asserted and Procedural History**

      Plaintiffs filed this case on July 17, 2024. Dkt. 1. Plaintiffs allege that Defendant failed to:

---

[1] Should the Court schedule a conference, Plaintiffs' Counsel will notify Plaintiffs of the date and time, as well as how to access the telephone conference line.

1) Pay overtime for work performed before and/or after Plaintiffs' scheduled shifts, including the time captured in the CityTime timekeeping system ("Pre- and Post-Shift Overtime Claim");

2) Pay Plaintiffs for work performed during Plaintiffs' unpaid, automatically deducted 30-minute meal periods ("Meal Period Claim");

3) Include required differentials in Plaintiffs' overtime pay rate ("Regular Rate Claim");

4) Pay overtime at the rate of one and one-half times the regular rate of pay by compensating Plaintiffs for hours in excess of 40 at a straight time rate ("Straight Time Overtime Claim"); and

5) Timely pay overtime ("Late Payment of Overtime Claim").

Plaintiffs also allege that Defendant's conduct lacked good faith and reasonableness, thus entitling Plaintiffs to liquidated damages in an amount equal to their backpay, and that Defendant willfully violated the law, thereby extending the statute of limitations from two to three years under 29 U.S.C. § 255(a).

Defendant filed their Answer on September 25, 2023. Dkt. 30. The Parties agreed to early mediation efforts, with the Defendant providing the CityTime and FISA data necessary to prepare damages calculations. The Plaintiffs' expert prepared damages calculations, and the Defendant's expert reviewed those calculations. The Parties participated in three early mediation sessions with mediator Carmen Rodriguez, Esq. on March 28, 2024, May 10, 2024, and June 6, 2024. Those mediation sessions did not result in settlement, and the Parties refocused their efforts on discovery. The Parties negotiated and entered into a Joint Stipulation on Phase One Discovery on July 11, 2024. Dkt. 48. The Parties engaged in early discovery, exchanging written discovery requests in August 2024. Plaintiffs deposed four Fed. R. Civ. P. 30(b)(6) corporate designees on topics related to the City's documents and computer programs that the City used to record information regarding Plaintiffs' work.

The Parties then met and conferred again on the possibility of reopening settlement discussions and requested referral to Your Honor for a settlement conference. Dkt. 56. The Court held pre-settlement calls on October 8 and 16, 2024. Dkt. 57; Dkt. 61. The Parties reached an agreement in principle on November 15, 2024. Dkt. 64.

## II.     Terms of the Proposed Settlement Agreement

The Agreement provides that Defendant will pay **$2,700,000** ("Settlement Amount") to resolve the lawsuit. The Settlement Amount will be paid as follows: (1) $1,162,500.00 in backpay (the "Backpay Amount") by checks made payable to each Plaintiff (via direct deposit for current employees or by check delivered to Plaintiffs' Counsel for separated employees) in the amount of each Plaintiff's share as determined by Plaintiffs' Counsel (described below); and (2) one check in the amount of $1,537,500.00  constituting liquidated damages, Service Awards, attorneys' fees,

and litigation expenses payable to Plaintiffs' Counsel for distribution to Plaintiffs ("Lump Sum Amount"). McGillivary Decl., ¶ 3.

Plaintiffs and their Counsel have signed agreements dictating how the attorneys' fee and the litigation expenses should be deducted from Plaintiffs' individual settlement payments prior to distribution of the Lump Sum Amount.[2] Pursuant to these individual retainer agreements signed by each of the 416 Plaintiffs at the outset of the litigation, the Lump Sum Amount will be distributed as follows: (1) $608,647.24 in liquidated damages ("Liquidated Damages"); (2) $34,279.14 in litigation expenses to Plaintiffs' Counsel; and (3) a one-third (33 and 1/3%) contingency fee to Plaintiffs' Counsel in the amount of $888,573.62 calculated after expenses are deducted.[3] Additionally, each Plaintiff has been notified that $6,000 in Service Awards ("Service Award Amount") will be paid out of the Lump Sum Amount to the two Plaintiffs who served as Settlement Team Members, with each receiving $3,000.00.

The Backpay Amount and Liquidated Damages portion of the Settlement Amount were calculated by Plaintiffs' Counsel and will be divided among the Plaintiffs as follows: For each week that a Plaintiff was employed as an ACHR or an HR during the recovery period, the Plaintiff received one point.[4]

The recovery period for each Plaintiff is three years prior to the date a Plaintiff's consent-to-sue form was filed in Court up to October 16, 2024, or their last day of employment as a ACHR

---

[2] Defendant takes no position regarding the distribution of the Lump Sum Amount as the distribution amounts were determined solely by Plaintiffs' Counsel pursuant to their agreement with Plaintiffs.

[3] Each Plaintiff individually agreed, in writing, to a one-third (33.33%) contingency fee when they retained the law firm.

[4] The methodology of using weeks of employment during the recovery period to determine the Plaintiffs' share of the settlement is the same methodology used in a multitude of other FLSA cases involving complicated off-the-clock claims and a variety of different claims wherein the risks and valuations of each claim and the amount of work time the Plaintiffs may win are difficult to separately quantify for each Plaintiff and for each claim. *E.g., Caldwell v. City of New York,* 1:23-cv-03899, Dkt. 44 (S.D.N.Y. May 30, 2024) (approving settlement for 33 Motor Vehicle Operators and Laborers with the Department of Homeless Services using the same distribution methodology). The following multi-plaintiff FLSA settlements approved by courts in the Southern District of New York have also used this same distribution methodology: *Moreno v. City of New York,* Case No. 1:22-cv-03358, Dkt. 43 (S.D.N.Y. Feb. 14, 2023); *Casis v. City of New York,* Case No. 1:22-cv-01926, Dkt. 54 (S.D.N.Y. Jan. 20, 2023); *Feiner v. City of New York*, 1:16-cv-08675, Dkt. 86 (S.D.N.Y. Jan. 16, 2023); *Williams v. City of New York*, Case No. 16-cv- 08671, Dkt. 101 (S.D.N.Y. Nov. 7, 2022); *De La Cruz v. City of New York,* Case No. 14-CV-9220, Dkt. 227 (S.D.N.Y. July 1, 2022); *Foster*, Case No. 14-cv-04142, Dkt. 242 (S.D.N.Y. Dec. 28, 2021)*, Matias v. City of New York*, Case No. 21-cv-1736, Dkt. 39 (S.D.N.Y. Oct. 29, 2021); *Campbell v. City of New York,* Case No. 16-cv-8719, Dkt. 186, (S.D.N.Y. Sept. 17, 2021); *Murray., v. City of New York*, Case No. 1:16-cv-08072, Dkt. 228 (S.D.N.Y. Apr. 23, 2021).

or HR, whichever is earlier. The points were then divided into $1,771,147.24 ("Net Settlement Fund")[5] to determine the dollar value of a point. Plaintiffs had until December 9, 2024, to review their settlement allocation and to lodge any disputes. There are no unresolved disputes or objections. McGillivary Decl., ¶ 6.

As mentioned, and as reflected in Paragraph 2.4 of the Agreement, Plaintiffs have entered into individual retainer agreements with Plaintiffs' Counsel. These agreements provide for a contingency attorney fee amount equal to one-third (33 and 1/3%) of the Settlement Amount calculated after litigation expenses are deducted from the Settlement Amount. Plaintiffs and their counsel are solely responsible for determining the contingency attorney fee applicable to this Agreement. Under the Settlement Agreement, Plaintiffs' Counsel shall deduct their contingency attorney fee in the amount of $888,573.62 from the Lump Sum Amount in accordance with Plaintiffs' individual agreements with Plaintiffs' Counsel.

In consideration and exchange for this Settlement, the Plaintiffs agree to release the Defendant for all wage and hour claims through October 16, 2024.

Each Plaintiff has been informed, in writing, of the Settlement Amount, the amount of expenses, the methodology for assigning points, the value of a point, and the number of points calculated for each Plaintiff using the Defendant's payroll data. Each Plaintiff was also informed of the amount of the total contingency fee, and their proportional amount of that fee, and the amount of the Service Awards. Each Plaintiff has been given the opportunity to object to the settlement and to dispute their assignment of points. They have also been given the opportunity to review the Settlement Agreement and the amount of the settlement awards of all other Plaintiffs. This information is posted on Plaintiffs' counsel's secured website. **There have been no unresolved disputes or objections**. The reaction of the Plaintiffs has been nothing but positive. McGillivary Decl., ¶ 6.

### III.    Applicable Factors for Approving FLSA Settlements

A settlement in an FLSA collective action is not effective unless it is approved by either a district court or the United States Department of Labor. *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 599-600 (2d Cir. 2020); *Cheeks v. Freeport Pancake House, Inc.,* 796 F.3d 199, 206 (2d Cir. 2015). "As a result, district courts in this Circuit routinely review FLSA settlements for fairness before approving any stipulated dismissal." *Id.* "Courts generally recognize a "strong presumption in favor of finding a settlement fair" in cases like this one brought under the FLSA, as they are "not in as good a position as the parties to determine the reasonableness of an FLSA settlement." *Martinez v. 189 Chrystie St. Partners*, LP, No. 22-CV-3111 (JLC), 2024 WL 1853179, at *2 (S.D.N.Y. Apr. 29, 2024); quoting *Souza v. 65 St. Marks Bistro*, No. 15-CV-327 (JLC), 2015 WL 7271747, at *4 (S.D.N.Y. Nov. 6, 2015). *See also Lliguichuzhca v. Cinema 60, LLC*, 948 F. Supp. 2d 362, 365 (S.D.N.Y. 2013) (same).

---

[5] The Net Settlement Fund is the amount remaining after litigation expenses, the 33.33% contingency fee, and Service Awards are deducted. Exhibit A to the Settlement lists Plaintiffs' distribution amounts after attorneys' fees, litigation expenses, and Service Awards are deducted.

December 13, 2024
Page 5

Courts evaluating whether FLSA settlements are reasonable consider the following factors:

(1) the plaintiffs' range of possible recovery;
(2) the extent to which the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses;
(3) the seriousness of the litigation risks faced by the parties;
(4) whether the settlement is the product of arm's-length bargaining between experienced counsel; and
(5) the possibility of fraud or collusion.

*Wolinsky*, 900 F. Supp. 2d at 336; *Fisher*, 948 F.3d at 599-600 ("District courts typically evaluate the fairness of a settlement agreement by considering the factors outlined in *Wolinsky*…."). Importantly, under the Second Circuit's *Fisher* decision, "[w]hen presented with a settlement for approval, a district court's options are to (1) accept the proposed settlement; (2) reject the proposed settlement and delay proceedings to see if a different settlement can be achieved; or (3) proceed with litigation." *Fisher,* 948 F.3d at 606.

### A. Application of the *Wolinsky* Factors to the Settlement

As discussed below, the proposed Settlement is fair and reasonable to Plaintiffs and the Defendant.

### 1. Plaintiffs' Possible Range of Recovery

The Backpay Amount and Liquidated Damages agreed to by the Defendant to resolve this case, before the expenses and contingency fee are deducted, is $2,319,000.00 ("Gross Damages Amount"). McGillivary Decl., ¶ 4. The Defendant also agreed to pay hourly statutory attorneys' fees and expenses in the combined amount of $375,000.00 and Service Awards in the amount of $6,000. These amounts were added to the Gross Damages Amount to arrive at the total Settlement Amount of $2,700,000.00. *Id.*

The Gross Damages Amount is based on damages calculations prepared by Plaintiffs' expert witness, Dr. Louis Lanier, which were reviewed and analyzed by Defendant's expert witness, Dr. Christopher Erath, as part of the Parties' arm's-length negotiations. McGillivary Decl., ¶ 5. The Gross Damages Amount is equal to approximately **81.5%** of what Plaintiffs could win on their best day in Court if Plaintiffs were successful in demonstrating to a jury that: (1) Plaintiffs worked through their unpaid meal periods on the occasions that Defendant's timekeeping system showed that they did not take a meal break and had no corresponding pay for that meal break; (2) Plaintiffs worked up to 15 minutes per day before and/or after their paid shifts without pay as reflected in the CityTime timekeeping system as uncompensated time; (3) Defendant failed to properly calculate the overtime pay rate; (4) Defendant failed to timely pay overtime compensation; (5) Defendant committed a willful violation, entitling Plaintiffs to a three-year statute of limitations; and (6) Defendant failed to establish both good faith and objective reasonableness thereby entitling Plaintiffs to a full compensatory award of liquidated damages. McGillivary Decl., ¶ 5.

The chart below reflects one way to look at the Gross Damages Amount reached through the Settlement on a claim-by-claim basis:

| Claim | Back Pay | Liquidated Damages |
|---|---|---|
| Regular Rate Claim | $17,839.97 (100%) | $17,839.97 (100%) |
| Straight Time Overtime Claim | $618.36 (100%) | $618.36 (100%) |
| Late Payment of Overtime Claim |  | $7,279.54 (75%) |
| Pre- and/or Post-Shift Overtime Claim | $111,968.12 (82%) | $110,668.44 (81%) |
| Meal Period Claim | $1,032,073.55 (82%) | $1,020,093.69 (81%) |
| **TOTAL** | **$1,162,500.00** | **$1,156,500.00** |

The three-year statute of limitations on the settlement of all claims is notable, because to achieve this outcome, Plaintiffs would have been required to prove that Defendant willfully violated the law; otherwise, a two-year statute of limitations would apply. 29 U.S.C. § 255 (a); *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).

A discussion of the Gross Damages Amount and the associated litigation risks with respect to each claim is set forth below.

***Full Relief on the Regular Rate and Straight Time Overtime Claims.*** On the Regular Pay Rate Claim, as well as the Straight Time Overtime Claim, the amounts listed above account for three years of full backpay damages, as well as a full award of liquidated damages equal to the backpay. The calculation of damages for these, and all other claims, was based on Defendant's payroll data.

***Late Payment of Overtime Claim.*** On Plaintiffs' Late Payment of Overtime Claim, which would have required Plaintiffs to prove at summary judgment or trial that Defendant, and not Plaintiffs, caused the delay in the payment for approved overtime work (e.g., by failing to timely submit requests for overtime work), the Settlement represents liquidated damages equaling 75% of the amount Plaintiffs would have sought at trial. The damages associated with the Late Payment of Overtime Claim are based on a three-year recovery and constitute liquidated damages to compensate Plaintiffs for the delayed, but eventual, payment for the overtime work.

***Uncompensated Pre-Shift Overtime Claim.*** The settlement damages associated with this Claim are calculated based on the unpaid time recorded in the CityTime timekeeping system up to 15 minutes per day total. For example, if in a workweek a Plaintiff worked 40 hours or more and the Plaintiff's CityTime data reflected an additional 15 minutes of uncompensated pre- and post-shift time on all 5 days in that workweek, 75 minutes (15 minutes multiplied by 5 days) of backpay overtime damages were assigned for that workweek for this claim. The settlement represents approximately 82% of the backpay damages associated with this claim. Additionally, the Settlement Amount represents an additional amount equal to 81% of the backpay as liquidated damages on the Pre- and/or Post-Shift Overtime Claim. Of course, Plaintiffs faced risk on this claim in proving through discovery, at the summary judgment stage, and/or at trial that the time captured in CityTime represented time worked ***and*** that the City knew or should have known about this work.

***Meal Period Claim.*** The Settlement represents 82% of the backpay damages owed if the Plaintiffs could prove they were performing work that the City knew or should have known about

every time the CityTime system demonstrated the Plaintiffs did not take a meal, and did not get paid for that work. Additionally, this Claim includes an amount equal to 81% of the backpay as liquidated damages. Plaintiffs faced risk on this Claim if it were pursued through discovery, at summary judgment, and trial because Plaintiffs carry the burden of proving the amount of time they worked through their unpaid meal periods each workweek, and that the City knew or should have known about this work.

Moreover, for the Pre-Shift Overtime and Meal Period Claims, even if Plaintiffs were successful in meeting their burden at summary judgment or at trial, it is possible that a jury could have awarded fewer minutes per day of pre-shift overtime and/or meal period work. Significantly, even if a jury ruled in Plaintiffs' favor, a jury may have found that these violations were not willful, resulting in a two-year, rather than three-year recovery period, and it is possible that the Court may not have awarded liquidated damages.

The Settlement Agreement provides for a non-reversionary $1,771,147.24 Net Settlement Fund for the 416 Plaintiffs, which is the amount to be distributed to the Plaintiffs after all fees, expenses, and Service Awards are deducted. Plaintiffs believe the Net Settlement Fund is equal to approximately **62%** of Plaintiffs' total claimed damages using a full three-year recovery period and a full award of liquidated damages. McGillivary Decl., ¶ 7. The average settlement payment to the 416 Plaintiffs after all fees, expenses and Service Awards are deducted is **$4,271.99.** *Id.* at ¶ 8.

Considering the risks associated with proceeding with these claims through discovery, motions practice, trial, establishing collective-wide damages, and possible appeals, the Net Settlement Fund amount is certainly a reasonable resolution, if not an excellent one. *See Rojas v. Pizza Pete's LLC*, 2019 WL 4447578, at *5 (S.D.N.Y. 2019) (net settlement of 36% of total alleged damages after deducting costs and counsels' 1/3 contingency fee is "clearly reasonable given the uncertainties inherent in any litigation"); *Chowdhury v. Brioni America, Inc.*, 2017 WL 5953171, at *2 (S.D.N.Y. 2017) (net settlement of 40% of FLSA plaintiffs' maximum recovery is reasonable); *Redwood v. Cassway Contracting Corp.*, 2017 WL 4764486, at *2 (S.D.N.Y. 2017) (net settlement of 29.1% of FLSA plaintiffs' maximum recovery is reasonable); *Felix v. Breakroom Burgers & Tacos*, 2016 WL 3791149, at *2 (S.D.N.Y. 2016) (net settlement of 25% of FLSA plaintiff's maximum recovery is reasonable).

In light of this range of recovery as compared to the amounts provided for under the Settlement Agreement, this Settlement represents an excellent result for the Plaintiffs on ***all*** claims.

### 2. Avoiding Anticipated Burdens and Expenses

Litigating FLSA claims through fact discovery, expert discovery, motions for summary judgment, motions to determine if collective treatment at trial is appropriate, and through a multi-day or multi-week trial, would be a resource-intensive process demanding significant additional costly litigation for both Parties.

Even with early settlement, significant time and labor has been spent by Plaintiffs' Counsel prior to and in reaching the Settlement. McGillivary Decl., ¶ 15; Pordy Decl. ¶ 17. During the time

spent litigating this case, Plaintiffs' Counsel have not been paid for any of the work that they have performed. *Ibid*. This uncompensated work has been substantial and includes: (1) interviewing Plaintiffs and investigating claims; (2) researching the claims and possible defenses; (3) preparing and filing the Complaint; (4) negotiating and reaching an agreement with Defense Counsel on the data necessary to calculate damages; (5) engaging an expert damages witness to prepare damages calculations and analyzing expert's models; (6) preparing multiple settlement demands; (7) preparation for mediation including preparing a mediation statement, and participating in pre-mediation calls with the Plaintiff Settlement Team to discuss settlement possibilities; (8) participate in three mediation sessions before Mediator Carmen Rodriguez, Esq. (9) negotiate a Joint Stipulation on Phase One Discovery, including extensive negotiations over the number of Plaintiff depositions, fact witness depositions, and Fed. R. Civ. P. 30(b)(6) depositions; (10) draft written discovery to City; (11) prepare objections and responses to City's written discovery requests; (12) draft Notices of Fed. R. Civ. P 30(b)(6) deposition on topics related to the City's documents and programs, timekeeping, Plaintiffs' job duties, and City's defenses; (13) prepare for and take four depositions of City designees on documents and programs used to record Plaintiffs' worktime; (14) begin process of identifying Phase One Plaintiffs (15) reengage in settlement discussions and prepare revised settlement demand; (16) prepare for and participate in two pre-settlement calls with the Court; (17) negotiate and draft the written terms of the Settlement Agreement; (18) notifying the Plaintiffs of the terms of the Settlement Agreement; (19) preparing the settlement approval papers; and (20) preparing for administration of the Settlement. McGillivary Decl., ¶ 15; Pordy Decl., ¶ 17.

Without this Settlement, both Parties would need to spend significant additional time and resources in extensive discovery, including preparing and responding to written discovery, numerous Plaintiff depositions, additional Fed. R. Civ. P. 30(b)(6) and fact witness depositions, expert discovery, motions practice, trial preparation, including meeting with and preparing numerous witnesses for trial testimony, preparing trial exhibits, motions *in limine*, pre-trial briefing, drafting jury instructions, voir dire, and a verdict form, preparing opening statements, presenting the case to a jury, preparing summation, presenting the issue of liquidated damages to the Court for a decision, likely post-trial motions practice, and possible appeal. In short, absent settlement, the anticipated burdens and expenses on both Parties were significant.

### 3. Seriousness of Litigation Risks

As noted above, there was risk to both sides on all claims, with the most significant risk for both sides in the possible ranges of recovery associated with the amount of uncompensated work performed on the claims that result in the most significant damages to Plaintiffs: Plaintiffs' Pre-Shift Claim and Meal Period Claim, as well as the issues of whether the Defendant's violations were willful and lacked good faith or reasonableness. Given the uncertainty over the potential outcome, both Parties were motivated to settle this dispute early in the litigation.

### 3. Arm's-Length Bargaining

Both Parties engaged in good faith, arm's-length negotiation in reaching this Settlement, including several telephonic settlement discussions prior to mediation, pre-mediation offer and counter-offer, email correspondence regarding damages calculations, three mediation sessions with Mediator Carmen Rodriguez, Esq., and two pre-settlement calls with Your Honor. Prior to those discussions, Plaintiffs' expert witness analyzed detailed payroll information and timekeeping records and shared those calculations and all underlying programing with Defendant. Defendant's expert reviewed and analyzed Plaintiffs' damages calculations, and these calculations were relied upon by the Parties to eventually agree to a Settlement Amount.

Ultimately, the Parties reached an agreement in principle on November 15, 2024, which was approved by the Settlement Team. McGillivary Decl., ¶ 2. Thereafter, the Parties further negotiated the terms of the Settlement Agreement. Without doubt, the Settlement was the product of arms-length bargaining.

### 4. Possibility of Fraud or Collusion

Given the thorough and intensive investigation into this matter by each side to prepare for settlement discussions, and the Parties' arm's-length negotiations with Your Honor's assistance and the assistance of Mediator Carmen Rodriguez, Esq., as well as the Parties' good faith participation, there was no opportunity for fraud or collusion. The Parties' Counsel represented their clients zealously and obtained what both Parties consider to be a fair and reasonable settlement of a *bona fide* dispute consistent with standards established in the Second Circuit for FLSA settlements.

## IV. The Service Awards to the Settlement Team Plaintiffs are Appropriate[6]

Courts in this district have recognized that, "[i]n FLSA collective actions, just as in Rule 23 class actions, service awards are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff." *See, e.g., Sanz v. Johnny Utah 51 LLC*, 2015 WL 1808935 (S.D.N.Y. 2015) (quoting *Diaz v. Scores Holding Co., Inc.*, 2011 U.S. Dist. LEXIS 112187, 2011 WL 6399468 at *3-4 (S.D.N.Y. 2011)).

---

[6] Defendant takes no position regarding the Service Award Amount provided to the Settlement Team as this distribution.

The Service Awards will be paid to the two Settlement Team members, both of whom served as Named Plaintiffs, assisted in settlement discussions, approved the Settlement, and recommended the Settlement to the collective. McGillivary Decl., ¶ 11. The Service Awards total **$6,000** and are approximately 0.20% of the **$2,700,000** Settlement Amount. All 416 Plaintiffs have been informed of the Service Award Amounts, and none have objected. McGillivary Decl., ¶ 11-12.

The Settlement Team spent time gathering facts for the initial Complaint, participating in telephonic meetings to discuss settlement strategy, participating in three Settlement Conference sessions in March, May, and June 2024, participating in numerous discovery calls, and participating in several mediation discussions when settlement talks resumed, reviewing damages calculations, assessing the various settlement scenarios and facilitating recommending the Settlement to the other Plaintiffs. McGillivary Decl., ¶ 11-12. Thus, the time and effort exerted by the Settlement Team resulted in a significant benefit to the collective. *Id*. The Settlement Team's willingness to serve the collective achieved favorable results for all 416 Plaintiffs (e.g., average individual settlement amount is **$4,271.99** *after* fees, expenses, and the Service Award Amount are deducted). *Id.* The Service Awards here are well within the range of awards approved by courts in this Circuit in FLSA cases. *See, e.g., Mercado v. Metropolitan Transportation Auth.,* 2023 WL 4350612, at *3 (S.D.N.Y. 2023) (approving service award of $12,500 to lead named plaintiff and $10,000 to each of four other named plaintiffs in FLSA action); *Williams v. City of New York*, Case No. 16-cv-08671 (S.D.N.Y.), Dkt. 100 (Nov. 7, 2022) (approving service awards of $4,500 each); *Hyun v. Ippudo USA Holdings,* 2016 WL 1222347, at *2 (S.D.N.Y. 2016) (awarding $6,000 to each of five named plaintiffs as service award, for $30,000 total equaling 5% of total settlement amount, in FLSA case); *Kudo v. Panda Restaurant Group, Inc.,* 2015 WL 13879800, at *4 (S.D.N.Y. 2015) (awarding $10,000 to named plaintiff and $5,000 each to four other plaintiffs); *Diaz v. Scores Holding Co., Inc.,* 2011 WL 6399468, at *3-4 (S.D.N.Y. Jul. 11, 2011) (awarding $7,000 to four named plaintiffs plus $1000 to two additional plaintiffs as service awards, totaling $30,000 and equal to approximately 7% of settlement in FLSA collective action).

### V.    The Attorneys' Fees and Costs are Reasonable[7]

Each of the 416 Plaintiffs signed a written contract with Plaintiffs' counsel at the outset of this case in which they agreed to a one-third (33 and 1/3%) contingency fee. McGillivary Decl., ¶ 17. Accordingly, under the Settlement, after expenses in the amount of $34,279.14 are reimbursed, Plaintiffs' Counsel will be paid $888,573.62, which represents a one-third (33 and 1/3%) contingency fee of the Settlement net of costs. *See Run Guo Zhang v. Lin Kumo Japanese Rest., Inc*., 2015 WL 5122530 at *1 (S.D.N.Y. 2015) ("The Court's view is that attorneys' fees, when awarded on a percentage basis, are to be awarded based on the settlement net of costs.").

---

[7] As described in the Settlement Agreement, each Plaintiff has entered into an individual agreement with Plaintiffs' Counsel that contain a contingency fee provision. Defendant is not a party to these agreements. As such, Defendant take no position regarding Section V of this letter other than that Defendant agreed to pay hourly attorneys' fees and costs in the amount of $375,000.

### A. Plaintiffs' Counsel's Private Fee Agreements, Made with Each of the 416 Plaintiffs, Should be Honored

When they retained Plaintiffs' Counsel, each of the 416 Plaintiffs signed fee agreements in which they agreed to pay one-third (33 and 1/3%) of the total recovery (including any hourly fees recovered from the Defendant). These agreements should be honored. By enforcing such agreements, the Court provides low income and individual plaintiffs with a powerful tool for enforcing their rights. As the Supreme Court has explained in the civil rights context, "[Nothing] in the legislative history … persuades us that Congress intended § 1988 to limit civil rights plaintiffs' freedom to contract with their attorneys." *Venegas v. Mitchell*, 495 U.S. 82, 87 (1990). This is because "depriving plaintiffs of the option of promising to pay more than the statutory fee if that is necessary to secure counsel of their choice would not further § 1988's general purpose of enabling such plaintiffs in civil rights cases to secure competent counsel." *Id*. at 89-90. Therefore, the fee-shifting provision of § 1988 "controls what the losing defendant must pay, not what the prevailing plaintiff must pay his lawyer." *Id*. at 90. The same holds true in the fee shifting context of the FLSA.[8]

Moreover, courts in this Circuit recognize that where small claims can only be prosecuted through aggregate litigation, such as in the instant FLSA case, attorneys who fill the "private attorney general" role must be compensated for their efforts through enforceable contingent fee agreements. *See, e.g., Viafara v. MCIZ Corp.,* 2014 WL 1777438 at *27-28 (S.D.N.Y. 2014) (approving 33 1/3 % fee consistent with norms of fee shifting litigation in Second Circuit); *Zeltser v. Merrill Lynch & Co*., 2014 WL 4816134, at *9 (S.D.N.Y 2014) (same); *Sukhnandan v. Royal Health Care of Long Island LLC*, 2014 WL 3778173, at *4 (S.D.N.Y. 2014) (same); *Clem v. KeyBank, N.A*., 2014 WL 2895918, at *10-11 (S.D.N.Y. 2014) (same). Indeed, many individual litigants, including the Plaintiffs here, likely "cannot afford to retain counsel at fixed hourly rates . . . yet they are willing to pay a portion of any recovery they may receive in return for successful representation." *deMunecas v. Bold Food, LLC*, 2010 WL 3322580 at *21-22 (S.D.N.Y. 2010) (quoting *In re Abrams*, 605 F.3d 238, 245-46 (4th Cir. 2010)).

---

[8] *See, e.g., Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, n.4 (2d Cir. 2007) (in ADEA case, which incorporates same fee-shifting provision as FLSA, Court concluded that attorney and client should be able to settle distribution of the attorney's fees "according to their own contract terms, which are beyond the province of this Court."); *Samaroo v. Deluxe Delivery Sys*., 2016 WL 1070346 at *9 n.4 (S.D.N.Y. 2016) (approving attorneys' fees and costs of more than 34% of the settlement noting that "I do not address the fee arrangement between plaintiffs and their counsel because I do not believe I am required to do so under *Cheeks*. As described in *Cheeks*, the purpose of the FLSA is to regulate the relationship between an employee and his employer and to protect the employee from over-reaching by the employer. I do not understand the FLSA to regulate the relationship between the employee as plaintiff and his counsel or to alter the freedom of contract between a client and his attorney."); *Chowdhury v. Brioni Am., Inc.*, 2017 U.S. Dist. LEXIS 196469, 2017 WL 5953171, at *15-16 (S.D.N.Y. Nov. 29, 2017) ("Finally, pursuant to a retainer agreement signed by plaintiffs, plaintiffs' counsel will receive one third of the settlement proceeds, exclusive of counsel's out-of-pocket costs, for contingency fees. Contingency fees of one-third in FLSA cases are routinely approved in this Circuit.").

Judge Gorenstein cogently described the reason that private contingent fee agreements should be honored in the context of FLSA cases:

> [A]ttorneys who take on FLSA cases on contingency bear the risk of having to litigate cases in which the recovery may not adequately compensate them for the time expended. *See generally King v. Fox*, 2004 WL 68397, at *5 (S.D.N.Y. Jan. 14, 2004) ("Contingency fees account for the risk taken in representing a client."). Therefore, in cases where attorneys spend fewer hours than would be required to match the amount in the contingency arrangement, it is only proper that they be permitted to collect their contracted fee given the risk they have assumed. "[A] contingency fee arrangement provides an incentive to counsel to take on cases that are less than sure winners." *Blizzard v. Astrue, 496 F. Supp.* 2d 320, 325 (S.D.N.Y. 2007). Finding such contingency fee arrangements not "reasonable" under *Cheeks* whenever the attorney is compensated at a high hourly rate as a result of the contingency arrangement — or when the fees paid to counsel exceed the "multiplier" that would be considered reasonable in a common fund case — will only serve to diminish the pool of attorneys willing to accept the risk of taking on FLSA cases. See *Almanzar*, ⸺ F.Supp.3d at ⸺, 2023 WL 6979460, at *3. ***Such a result runs counter to one of the purposes of the FLSA — to provide an avenue for workers deprived of their just wages to seek redress in the courts — and is therefore rejected.*** *Id.*

*Puerto v. Happy Life Home Health Agency Inc*, 2023 WL 8258103, at *2 (S.D.N.Y. 2023) (emphasis added) (citations in original).

In *Puerto*, the Court found that the one-third contingency fee, exclusive of costs, "is the customary contingency percentage in FLSA cases." *Id.* Further, the Court noted that "Counsel was engaged to represent plaintiff on a one-third contingency fee basis, which in and of itself provided counsel with a strong incentive to settle the case for the maximum recovery possible." *Id.* at *2. Likewise here, the contingency fee itself provided Plaintiffs' Counsel with a strong incentive to settle the case for the maximum recovery possible.

As mentioned, here, the 416 Plaintiffs entered into a private fee agreement to pay their "private attorneys general" a one-third (33 and 1/3%) contingency fee.[9] The agreement provides:

> In consideration of the services of McGillivary Steele Elkin LLP and Spivak Lipton LLP ("MSE and SL"), and such other law firms with whom they deem necessary to work on my case, I agree to pay such attorneys 33 and 1/3% (thirty-three and 1/3 percent) of my total gross recovery (inclusive of attorneys' fees recovered from defendants) as attorneys' fees. In the event that MSE and SL recovers attorneys' fees from the defendants in this action, and such fees are in an amount equal to or above the contingent fee, I will not pay a contingent fee and

---

[9] A copy of the contingency fee agreement signed by Plaintiff Vincent Gismundi (with Personally Identifiable Information redacted) is attached to the Declaration of Gregory K. McGillivary as Exhibit B
. This is the same agreement each of the 416 Plaintiffs signed. McGillivary Decl., ¶ 14.

> MSE and SL will retain all of the attorneys' fees recovered from the defendant as payment for legal services. If the complaint brought on my behalf results in no recovery, I will have no obligation to pay attorneys' fees.

McGillivary Decl., Ex. B, at 2.

The fee arrangement entered into between the Plaintiffs and their counsel, in turn, was expressly incorporated into the Settlement Agreement:

> 2.4   Plaintiffs have entered into individual agreements with Plaintiffs' Counsel. Each of these retainer agreements provides for a contingency attorney fee equal to thirty-three and one-third percent (33 and 1/3%) of the Settlement Amount, after deducting expenses in the amount of $34,279.14. Plaintiffs and their counsel are solely responsible for determining the contingency attorney fee applicable to this Agreement. Plaintiffs' Counsel shall deduct their contingency attorney fee in the amount of $888,573.62 from the Lump Sum Amount in accordance with Plaintiffs' individual agreements with Plaintiffs' Counsel.

Exh. 1, ¶ 2.4.

Enforcing the fee agreement here allows Plaintiffs to hire nationally recognized experts in the FLSA and wage and hour law, and their expertise benefited the Plaintiffs greatly. Indeed, collectively, Mr. McGillivary, Ms. Pordy and the attorneys at McGillivary Steele Elkin LLP and Spivak Lipton LLP have litigated hundreds of FLSA cases, including many in this Court. McGillivary Decl., ¶¶ 19-33; Pordy Decl., ¶¶ 9-10. Plaintiffs benefited greatly from this level of expertise.

Plaintiffs' Counsel undertook to prosecute this action without any guarantee of payment. McGillivary Decl., ¶ 15; Pordy Decl. ¶ 15. Plaintiffs' Counsel were required to make a significant investment of time and resources without a guarantee of payment of any kind. Plaintiffs' claims would have been hard fought at summary judgment and trial by Defendant, and Defendant would have attempted to move for summary judgment, or, at trial, judgment as a matter of law to reduce or eliminate the damages owed to the Plaintiffs.

As reflected in the Settlement Agreement and in each of the retainer agreements, Plaintiffs understood that they would be paying a contingency fee of 33 and 1/3% of the total recovery (after deduction for expenses) when they retained Plaintiffs' Counsel. They are entitled to the benefit of their bargain and to the expertise of their chosen counsel. Moreover, all 416 Plaintiffs have been notified of the actual dollar amount that will be deducted from their settlement payment as attorneys' fees, and none have objected.

### B. The Percentage Sought for Attorneys' Fees Consistent With Court Approved Fees in Similar Cases

The one-third contingency fee that Plaintiffs seek here is the norm. "[C]ourts regularly approve attorney's fees of one-third of the settlement amount in FLSA cases.'" *Xiao v. Grand Sichuan Intn'l St. Marks, Inc.*, 2016 WL 4074444 at *3 (S.D.N.Y. 2016) (citing *Meza v. 317*

*Amsterdam Corp.*, 2015 WL 9161791 (S.D.N.Y. 2015)). *See also Martinez v. 189 Chrystie St. Partners, LP*, 2024 WL 1853179, at *2 (S.D.N.Y. 2024) ("Although there is not a proportionality requirement, attorney's fees in FLSA cases generally amount to a third of the settlement award…"); *Manjarrez v. Bayard's Ale House LLC*, 2022 WL 17363952, at *2 (S.D.N.Y. 2022) (attorneys' fees pursuant to an FLSA settlements "generally amount to a third of the settlement award."); *Bannerman v. Air-Sea Packing Grp.*, 2020 WL 408350, at *3 (S.D.N.Y. 2020) (approving attorneys' fees of 33 and 1/3%); *Bryant v. Potbelly Sandwich Works, LLC*, 2019 WL 1915298, at *15 (S.D.N.Y. 2020) (in FLSA/Rule 23 hybrid, approving one-third as "reasonable and well within the accepted range awarded in wage and hour cases in this District and throughout the Second Circuit"); *Cruz v. Sal-Mark Rest. Corp.,* 2019 WL 355334 at *21 (N.D.N.Y. 2019) (approving one-third fee, noting that a "presumptively reasonable fee takes into account what a reasonable, paying client would pay" and this "supports a one-third (33 and 1/3%) recovery in a case like this one where Class Counsel's fee entitlement is entirely contingent upon success"); *Chung v. Brooke's Homecare LLC,* 2018 WL 2186413, at *3-4 (S.D.N.Y. 2018) (awarding one-third fee, noting that "Courts routinely award 33 and 1/3% of a settlement fund as a reasonable fee in FLSA cases"); *Penafiel v. Babad Mgmt. Co., LLC,* 2018 WL 1918613 at *9 (S.D.N.Y. 2018) (awarding 33.3% fee, noting "Contingency fees of one-third in FLSA cases are routinely approved in this Circuit").

"[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Fisher,* 948 F.3d at 606 (quoting *Farrar v. Hobby*, 506 U.S. 103, 114, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992)) (internal quotation marks omitted). The average net award in this case is **$4,271.99** per Plaintiff after the contingent fee, all expenses, and Service Awards are paid. This is an excellent result.

### C. In Light of the Fee Agreements, A Lodestar Crosscheck Is Unnecessary.

While a lodestar crosscheck is optional in traditional percentage of common fund cases (where, unlike here, there are absent class members who did not contract to pay any particular fee), it is unnecessary here in light of the fee agreements between each of the Plaintiffs and their counsel. As Magistrate Judge Gorenstein recently explained:

> We decline to perform a 'lodestar cross check' because it would have no bearing on our assessment of the reasonableness of the fee sought if it turned out that the 'lodestar' for counsel's hours (that is, a reasonable hourly rate multiplied by the reasonable number of hours expended) is far less than the one-third contingency payment.

*Puerto,* 2023 WL 8258103, at *2; *Martinez v. 189 Chrystie St. Partners, LP*, No. 22-CV-3111 (JLC), 2024 WL 1853179, at *2 (S.D.N.Y. 2024) ("Notably, some courts have chosen not to compare the contingency payment to the actual hours expended by counsel, and there is much force to that approach as well."). As Judge Gorenstein explained:

> [T]here is no common fund created by the settlement. Instead, the plaintiff and the attorney agreed in advance that the attorney would be entitled to one-third of the settlement as attorney's fees. The very purpose of a contractual contingency fee

arrangement is to ensure recovery for an attorney <u>regardless of the number of hours actually expended by the attorney</u>.

*Puerto*, 2023 WL 8258103, at *2 (emphasis in original). S*ee also Wynne v. City of New York*, Case 1:23-cv-09955-GWG (December 10, 2014) ("Each of the 212 plaintiffs "signed an individual contingency fee agreement in this case, in which the Plaintiffs agreed to a 33 and 1/3 % contingency fee." As we have previously written in *Puerto*, 704 F. Supp. 3d at 406, we will not compare the one-third contingency payment to the actual hours expended by counsel — commonly called a "lodestar cross check" — to determine the reasonableness of the fee as many other courts do. We decline to perform a "lodestar cross check" because it would have no bearing on our assessment of the reasonableness of the fee sought if it turned out (as is true here) that the "lodestar" for counsel's hours (that is, a reasonable hourly rate multiplied by the reasonable number of hours expended) is far less than the one-third contingency payment.") (internal citations omitted); *Caldwell v. City of New York*, Case No. 23-cv-10730-RFT, Dkt. 74 (December 4, 2024) ("I decline to perform a lodestar cross check, because I believe doing so is unnecessary in light of the fee agreements between each Plaintiff and his or her counsel[.]") *Guillermo v. Starting C&M Corp.*, 2024 WL 1859733, at *2 (S.D.N.Y. Apr. 29, 2024) (Judge Subramanian declining to perform a lodestar cross check when there is a contractual contingency fee agreement in place); *Disla v. City of New York*, Case No. 22:cv-06693 (S.D.N.Y.), Dkt, 48 (May 19, 2023) (Parties' Request for Approval of Settlement Agreement) and Dkt. 49 (May 22, 2023) (Magistrate Judge Netburn approving FLSA settlement, inclusive of contingency fee of 33.3%, without a lodestar cross-check);

The same is true here. This is not a true common fund case because the Plaintiffs and their attorneys agreed in advance that their attorneys would be entitled to 33 and 1/3% of the settlement as attorneys' fees. Nor is this a Rule 23 class action where there are absent class members. Instead, here, each Plaintiff individually retained Plaintiffs' Counsel to represent them pursuant to the contingency fee agreement that they each signed, and consistent with those agreements, no Plaintiff raised any disputes or objections to the attorneys' fee amount.

Plaintiffs' Counsel's one-third contingent fee agreements with the 416 Plaintiffs in this case is reasonable, and, as explained further in Section I.B, the fee agreements provide for a percentage that is the customary contingency percentage in FLSA cases. Thus, the agreements are consistent with public policy to provide an avenue for workers deprived of their just wages to seek redress in the court through representation by competent counsel. For these reasons, this Court should "enforce the parties' intentions in a contingent fee agreement, as with any contract." *Alderman v. Pan Am World Airways*, 169 F.3d 99, 103 (2d Cir. 1999).

### D. The Lodestar in this Case is Well Within the Range Approved By Courts in the Second Circuit, Encourages Early Settlement, and Will Only Continue to Diminish

Setting aside the fact that each Plaintiff entered into a contingent fee agreement with Plaintiffs' Counsel, a lodestar cross-check demonstrates that the Settlement is fair and reasonable based on approved fee awards within the Second Circuit.

"Courts regularly award lodestar multipliers of up to eight times lodestar, and in some cases, even higher multipliers." *Martignago v. Merrill Lynch & Co.*, No. 11-CV-03923-PGG, 2013 WL 12316358, at *9 (S.D.N.Y. Oct. 3, 2013); *Yuzary v. HSBC Bank USA, N.A.*, No. 12 CIV. 3693 PGG, 2013 WL 5492998, at *11 (S.D.N.Y. Oct. 2, 2013) (awarding lodestar multiplier of approximately 7.6 in wage and hour case and noting that it "falls within the range granted by courts"); *Bryant v. Potbelly Sandwich Works, LLC,* 2019 WL 1915298, at *19 (S.D.N.Y. 2020) (multiplier of two to six is common and higher lodestars often awarded); *Ramirez v. Lovin' Oven Catering Suffolk, Inc.*, No. 11 Civ. 520, 2012 U.S. Dist. LEXIS 25060, 2012 WL 651640, at *4 (S.D.N.Y. Feb. 24, 2012) (granting attorneys' fees equal to 6.8 times lodestar in wage and hour action); *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 184-86 (W.D.N.Y. 2011) (awarding multiplier of 5.3 in wage and hour class action); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481–82 (S.D.N.Y. 2013) (approving multiplier of 6.3 and collecting cases of multipliers approved in wage and hour litigation from 2.09 to 8.3); *Maley v. Del Global Techs. Corp.*, 186 F.Supp.2d 358, 371 (S.D.N.Y.2002) ("modest multiplier" of 4.65 in wage and hour class action was "fair and reasonable"); *Cosgrove v. Sullivan*, 759 F.Supp. 166, 167 n. 1 (S.D.N.Y.1991) (awarding multiplier of 8.74).

In *Yuzary*, the Court explained that where "a multiplier is near the higher end of the range of multipliers that courts have allowed," in that case 7.6, "this should not result in penalizing plaintiffs' counsel for achieving an early settlement, particular where, as here, the settlement amount is substantial." *Yuzary*, No. 12 CIV. 3693 PGG, 2013 WL 5492998, at *11 (citing *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 121 (2d Cir. 2005) ("[T]he lodestar create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits."); *Savoie v. Merchants Bank,* 166 F.3d 456, 461 (2d Cir.1999) ("[T]he percentage-of-the-fund method also removes disincentives to prompt settlement, because plaintiffs' counsel, whose fee does not increase with delay, have no reason to drag their feet.").

The Court further noted that the 7.6 lodestar multiplier in *Yuzary* was "also reasonable because it will diminish over time." *Yuzary*, 2013 WL 5492998, at *11. Where "counsel will be required to spend significant additional time on this litigation in connection with implementing and monitoring the settlement, the multiplier will actually be significantly lower' because the award includes not only time spent prior to the award, but after in enforcing the settlement*." Sewell v. Bovis Lend Lease, Inc.*, No. 09 CIV. 6548 RLE, 2012 WL 1320124, at *13 (S.D.N.Y. Apr. 16, 2012) ("A lodestar multiplier of **three** falls well within the range granted by our Courts and equals the one-third percentage being sought.") (emphasis supplied). "The fact that Class Counsel's fee award will not only compensate them for time and effort already expended, but for time that they will be required to spend administering the settlement going forward, also supports their fee request." *Yuzary*, 2013 WL 5492998, at *11.

Here, the case involves the claims of 416 individual Plaintiffs. Plaintiffs' Counsel — including paralegals and the Litigation Director — will expend significant additional time administering the settlement after it is approved, including: 1) responding to Plaintiff inquiries regarding the date of payment; 2) drafting correspondence to accompany Plaintiffs' payments, 3) preparing and submitting required tax documentation under the Settlement; 4) responding to Plaintiffs' inquiries regarding payment method, updated addresses and the tax treatment of payments; and 5) maintaining the password protected client website to continue to post updates

regarding the payment dates for Plaintiffs' backpay and liquidated damages. In Plaintiffs' Counsel's experience, in a collective action of this size, this work could extend for several months or up to a year after the Settlement is approved. McGillivary Decl., ¶16.

Currently, the lodestar is **$541,461.50**, and the lodestar multiplier, which will only continue to diminish, is **1.64.** *See* McGillivary Decl., ¶ 13; Pordy Decl., ¶¶ 18.

Thus, while a lodestar cross-check is not required given the 416 individual contingency fee agreements retaining Plaintiffs' Counsel based on a 33 and 1/3% contingency fee, a lodestar cross-check supports the reasonableness of the Settlement Agreement.

### VI. Approval of Plaintiffs' Counsel's Expenses is Warranted

Plaintiffs' Counsel has incurred $34,279.14 in out-of-pocket expenses. Plaintiffs' Counsel, who advanced all litigation expenses without any guarantee of reimbursement, are now entitled to reimbursement of their out-of-pocket litigation expenses from the settlement fund. 29 U.S.C § 216(b). A detailed breakdown of the expenses incurred by McGillivary Steele Elkin LLP is attached to the Declaration of Gregory K McGillivary as Exhibit A. A detailed breakdown of the expenses incurred by Spivak Lipton LLP is attached to the Declaration of Hope Pordy as Exhibit B. Plaintiffs' Counsel's expenses, including expert fees, copying, electronic research, and printing, were reasonable and necessary to counsel's representation of Plaintiffs. *McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 390 (S.D.N.Y. 2017) (awarding expenses for experts, copying, electronic research, travel and printing, and other out-of-pocket expenses). Plaintiffs have been informed of the amount of expenses to be repaid to Counsel as well as their proportional share of those expenses and none has objected. McGillivary Decl., ¶ 9-10.

### VII. Conclusion

For the above reasons, this Settlement is a favorable outcome and will appropriately compensate Plaintiffs for the overtime pay issues that are the subject matter of this litigation. Accordingly, the Parties respectfully submit that the Settlement, in its entirety, is fair and reasonable and should be approved by the Court.

Sincerely,

McGILLIVARY STEELE ELKIN LLP


/s/ Gregory K. McGillivary
Gregory K. McGillivary

cc:   All Counsel of Record (via ECF)